Filed 8/31/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| KURT STOETZL et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>STATE OF CALIFORNIA et al.,<br><br>        Defendants and Respondents. | A142832<br><br>(San Francisco County<br>Super. Ct. No. CJC11004661) |

Plaintiffs are current and former correctional peace officers who work or worked at various state correctional facilities. They brought these coordinated class actions alleging they were improperly denied pay for time they spent under their employer's control before and after their work shifts. Ruling that plaintiffs' entitlement to overtime pay is controlled by federal, rather than California, law, the trial court entered judgment for defendants.[1] We shall reverse the judgment in part as to the subclass of unrepresented employees and affirm as to the subclass of represented employees.

---

[1] The three coordinated actions are *Stoetzl et al. v. State of California*, CGC-08-474096, filed in the San Francisco County Superior Court (the *Stoetzl* action); *Shaw et al. v. State of California*, 10C0081, filed in the Kings County Superior Court (the *Shaw* action); and *Kuhn et al. v. State of California*, BC450446, filed in the Los Angeles County Superior Court (the *Kuhn* action). Defendants are the State of California, the California Department of Corrections and Rehabilitation (CDCR), the California Department of Mental Health, and the California Department of Personnel Administration (DPA). We shall refer to defendants collectively as "the State."

# I. BACKGROUND

## A. The Actions

Plaintiffs alleged they were not paid for all the time they spent at the correctional institutions under defendants' control. Specifically, they were expected to sign in and sign out on time sheets that reflected only their officially assigned work day. Plaintiffs were required to be at their assigned posts at the beginning of their official shifts. However, the sign-in and sign-out locations were often significantly removed from plaintiffs' actual work posts, and they were not compensated for the time it took to travel from those locations to their work posts after signing in or to return to those locations to sign out at the end of a shift. Second, plaintiffs alleged that they were required to spend time before checking in and after checking out on such activities as being briefed before a shift, briefing relief staff at work posts after a shift, checking out and checking in mandated safety equipment, putting on and removing mandated safety equipment, waiting in lines, submitting to searches at security checkpoints, and taking inventories of weapons, ammunition, and other equipment. Plaintiffs were either not allowed to or were discouraged from adjusting their time logs to reflect these additional tasks. Plaintiffs alleged causes of action for failure to pay contractual overtime (Lab. Code,[2] §§ 222, 223) (first cause of action), failure to pay the California minimum wage (§§ 1182.11, 1182.12, 1194; 8 Cal. Code Regs. § 11000 et seq.) (second cause of action), failure to keep accurate records of hours worked (§ 1174) (third cause of action), and failure to pay overtime in breach of common law contractual obligations (fourth cause of action). They sought unpaid overtime wages, unpaid California minimum wages, liquidated damages, and injunctive relief.

In the *Stoetzl* action, the trial court certified a class of "[a]ll persons who are or who have been employed as Correctional Officers, Correctional Sergeants, Correctional Lieutenants, Medical Technical Assistants, Senior Medical Technical Assistants, Correctional Counselors I, Correctional Counselors II, Youth Correctional Officers,

---

[2] All undesignated statutory references are to the Labor Code. All rule references are to the California Rules of Court.

and/or Youth Correctional Counselors to work at adult and/or youth correctional institutions within the [CDCR] in the period commencing April 9, 2005 until the notice of pendency of this class action is given." The *Stoetzl*, *Shaw*, and *Kuhn* actions were later coordinated. (Code Civ. Proc., § 404 et seq.; rule 3.501 et seq.) The court granted class certification in the *Shaw* and *Kuhn* actions and, by stipulation, certified two subclasses for the three coordinated cases, one of unrepresented supervisory employees (consisting of Senior Medical Technical Assistants, some subclassifications of Correctional Officer II's, Correctional Sergeants, and Correctional Lieutenants) and one of represented employees (consisting of the remaining job classifications).[3]

## B. Judgment on the Pleadings

The State moved for judgment on the pleadings. The trial court granted the motion without leave to amend as to the causes of action for failure to pay overtime in violation of sections 222 and 223 and failure to keep accurate records of hours worked, and denied the motion as to the remaining causes of action.

## C. Trial

### 1. Threshold Legal Issues

The parties stipulated that the trial would be bifurcated into multiple phases. In Phase I, several threshold legal issues would be tried to the court. The issues were: "<u>Compensability</u> [¶] (a) Whether the California state law standard of compensability (the 'control standard') or the [federal Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq. (FLSA)] standard of compensability ('first principal activity of the day') establishes the standard for determining plaintiffs' compensable hours worked; as to Represented Employees: During the relevant time period, did the parties agree the FLSA would constitute the controlling legal standard for determining represented employees' compensable hours worked? [¶] <u>Minimum Wage</u> [¶] (b) Whether Labor Code sections 1182.11, 1182.12, 1194 and 8 CCR section 11000 *et seq.* and/or the Wage Orders apply

---

[3] Employees in the job classification of Correctional Counselor II (Supervisor) were later excluded from the class of unrepresented employees and dismissed from the action.

to the state employer for purposes of establishing the minimum wage applicable to plaintiffs. [¶] (c) Represented Employees: During the relevant time period, did the parties contractually agree to apply the federal minimum wage instead of the California minimum wage and, if so, is such an agreement enforceable? [¶] Breach of Contract Claims [¶] (d) Is there any legal prohibition, including but not limited to, the Ralph C. Dills Act (Govt. Code § 3512, *et seq.*) for represented employees and the Bill of Rights for State Excluded Employees (Govt. Code § 3525, *et seq.*) for unrepresented employees, against stating a claim for breach of common law contract regarding the terms and conditions of employment against the state, or against an employee receiving overtime for hours worked beyond their regular work schedules? [¶] (e) For represented employees, what contractually enforceable overtime policies existed when (1) the 2001-2006 MOU was in effect, including by operation of Government Code § 3517.8 until September 18, 2007, (2) the State's Implemented Terms were in effect, and (3) once the 2011-2013 MOU took effect? [¶] (f) Assuming represented employees can state a common law contract claim, were represented employees required to exhaust contractual grievance procedures and/or other administrative remedies prior to bringing a civil breach of contract action? [¶] (g) Assuming unrepresented employees can state a common law contract claim, what contractually enforceable overtime policies existed during the class period?"

2. *Stipulations and Evidence at Trial*[4]

a. Represented Employees

The California Correctional Peace Officers' Association (CCPOA) is the exclusive collective bargaining representative for members of the subclass of represented employees. Labor relations between CCPOA and the State are governed by the Ralph C. Dills Act (Gov. Code, § 3512 et seq.) (the Dills Act), which provides for collective bargaining over wages, hours, and other terms and conditions of employment. The Department of Human Resources (CalHR, formerly known as the Department of

---

[4] The parties stipulated to certain facts and legal conclusions for purposes of the Phase I trial, and additional evidence was admitted at trial.

4

Personnel Administration or DPA) represents the Governor of California as the state employer for purposes of collective bargaining with the CCPOA. The Dills Act allows parties to agree to a memorandum of understanding (MOU) to supersede certain provisions of law. (Gov. Code, § 3517.61.) After the parties reach an agreement, they submit a joint MOU to the Legislature, when appropriate, for approval. (Gov. Code, § 3517.5.)

The FLSA establishes overtime pay requirements for hours worked in excess of 40 per week. (29 U.S.C. § 207(a).) An exemption from this requirement exists for peace officers: An employer may establish a regular work period of up to 171 hours in a 28-day period, and must pay overtime only after the employee works more than 171 hours in the work period. This is known as the "7k Exemption." (See 29 U.S.C. § 207(k); see also 29 C.F.R. §§ 553.201, 553.230.)

The State, through CalHR, and CCPOA have negotiated multiple MOU's since 1982 on behalf of the represented plaintiffs' collective bargaining unit, State Bargaining Unit 6. Before 1998, the MOU's generally provided for a 40-hour workweek. The MOU in effect from July 1, 1998 to June 30, 1999 contained a section entitled "7k Exemption," which began, "CCPOA and the State agree that the employees listed below are working under the provisions of Section 207k of the Fair Labor Standards Act (FLSA) and the parties acknowledge that the employer is declaring a specific exemption for these employees under the provisions specified herein." It provided for a "7k schedule" of 168 hours in a 28-day work period for certain job classifications and defined "overtime" as hours worked in excess of 168 hours. For Correctional Officers, Medical Technical Assistants, Youth Correctional Officers, and Youth Correctional Counselors, the 168 compensated hours consisted of 160 hours of regular posted duty, four hours for pre- and post-work activities, and four hours for training. Section 11.12 of the 1998-1999 MOU stated that "CCPOA agrees that generally this is sufficient time for all pre and post work activities during each work period, and that the compensation allotted for these activities under this provision is full compensation for all of these activities," that "[t]he State and CCPOA agree that they have made a good faith attempt to comply with all requirements

5

of the FLSA in negotiating this provision. If any court of competent jurisdiction declares that any provision or application of this Agreement is not in conformance with the FLSA, the parties agree to Meet and Confer immediately . . . ," and that "CCPOA agrees that neither it nor any of its employees acting on their own behalf or in conjunction with other law firms shall bring any suit in court challenging the validity of this provision under the FLSA."

The State's chief negotiator for the 1998-1999 MOU, David Gilb, testified that the 7k schedule was designed to address the question of whether employees' work started when they picked up their equipment or when they reported to their posts. During negotiations, he defined pre- and post-work activities as work that began when employees picked up their tools in the central control area. The work could include walking from the control area to the post and participating in a brief pre-shift meeting. The State took the position that under the FLSA, it was not obligated to compensate employees for time they spent between entering the institution and picking up their equipment or the time after the equipment was returned, and CCPOA's negotiators understood this was the State's position. During the course of the negotiations, there was no discussion of whether the State would have to comply with California wage and hour laws. A member of the CCPOA's negotiating team, David Lewis, testified that he did not believe California law applied to the 7k schedule and that he did not raise the subject of California law because the parties were negotiating under federal law. The Legislature approved the 1998-1999 MOU, and it was signed by the Governor and chaptered into law by the Secretary of State. (Stats. 1998, ch. 820, § 2, p. 5135.)

The MOU in effect from July 1, 1999 to July 2, 2001 continued the relevant provisions of the 1998-1999 MOU. CCPOA's negotiators understood that when a provision was "rolled over" from one MOU to the next, the bargaining history was rolled over as well. This MOU was approved by the Legislature, signed by the Governor, and chaptered into law. (Stats. 1999, ch. 778, § 6(b), p. 5613.)

The MOU in effect from July 1, 2001 to July 2, 2006 provided for a 7k schedule of 164 compensated hours in a 28-day work period, four of which were for pre- and post-

work activities for represented Correctional Officers, Medical Technical Assistants, Youth Correctional Officers, and Youth Correctional Counselors. Correctional Counselor I and Correctional Counselor II Specialists also had a 164-hour schedule. "Overtime" was defined as any hours worked in excess of that schedule, and required pay at one and a half times the regular rate of pay. The MOU provided, "CCPOA agrees that generally this is sufficient time for all pre and post work activities during each work period, and that the compensation allotted for these activities under this provision is full compensation for all of these activities. This section shall not result in changes to the shift start/stop times." It included provisions identical to those in the earlier MOU's reciting that the parties had made a good faith attempt to comply with the FLSA and that CCPOA would not bring an action challenging the validity of the 7k schedule under the FLSA. Like its predecessors, the 2001-2006 MOU was approved by the Legislature, signed by the Governor, and chaptered into law. (Stats. 2002, ch. 1, § 2, p. 3.)

CCPOA and the State continued to give effect to these provisions from July 2, 2006 to September 18, 2007, as the parties negotiated unsuccessfully for a new MOU to succeed the 2001-2006 MOU. (See Gov. Code, § 3517.8, subd. (a).) On September 18, 2007, the State imposed on CCPOA and the represented employees the terms of its "last[,] best[,] and final offer," without substantive modification to the provisions discussed above. (See Gov. Code, § 3517.8, subd. (b).) The Legislature did not approve or ratify these terms.

The State and CCPOA entered into a new MOU on May 16, 2011, which was set to expire July 2, 2013. The 2011-2013 MOU recited that the parties were working under the provisions of section 207(k) of the FLSA (29 U.S.C. § 207(k)), continued the 164-hour, 28-day work period for represented employees, consisting of 160 hours for posted duty and four hours for pre- and post-work activities, and defined "overtime" as any hours worked in excess of that schedule. It did not include the language found in the earlier MOU's providing that four hours constituted sufficient compensation for pre- and post-work activities. In a side letter, the parties agreed that no changes to the MOU's language would have a prejudicial effect on either side's arguments in the *Stoetzl* action.

7

At all times relevant to this action, it has been the State's practice to pay represented employees overtime compensation, at one and a half times the regular rate of pay, for all reported time worked in excess of 164 hours in a 28-day work period.

    b.  Unrepresented Employees

Labor relations between the unrepresented employees are governed by the Bill of Rights for State Excluded Employees (Gov. Code, § 3525 et seq.), which does not permit collective bargaining.  No MOU governs their hours, wages, or other terms and conditions of employment.  Their regular working schedule was 40 hours of regular compensated duty during each work week.  Correctional Sergeants, Correctional Lieutenants, and Senior Medical Technical Assistants were paid overtime at one and a half times the regular rate of pay for reported time in excess of that.  Unrepresented employees did not receive the four hours of block pay for pre- and post-work activities that some represented employees received.

CalHR used the California Pay Scale Manual to document the salaries for state employees.  The Pay Scale Manual established "Work Week Groups" under the FLSA.[5] The unrepresented workers are members of Work Week Group 2.  The manual provided: "Overtime for employees in classes not eligible for exemption under Section 7K of the FLSA is defined as all hours worked in excess of 40 hours in a period of 168 hours or seven consecutive 24-hour periods."  Under the heading, "Hours Worked," it stated, "For the purpose of identifying hours worked under the provisions of the FLSA, only the time

---

[5] Government Code section 19843, subdivision (a) provides:  "For each class or position for which a monthly or annual salary range is established by the department [i.e., CalHR, see Gov. Code, § 19815, subd. (a)], the department shall establish and adjust workweek groups and shall assign each class or position to a workweek group.  The department, after considering the needs of the state service and prevailing overtime compensation practices, may establish workweek groups of different lengths or of the same length but requiring different methods of recognizing or providing compensation for overtime.  The department may also provide for the payment of overtime in designated classes for work performed after the normal scheduled workday or normal scheduled workweek."

spent which is controlled or required by the State and pursued for the benefit of the State need be counted. . . .”

Under the heading, “Determination of Coverage under FLSA,” the Pay Scale Manual provided: “The provisions of Work Week Group 2 are made applicable to all classes which are determined by the Director of the Department of Personnel Administration to include positions subject to the FLSA.” The DPA had determined that all the job classifications included in the Unrepresented Employees subclass were subject to the FLSA.

### 3. Trial Court's Ruling

The trial court ruled in favor of the State on all issues at the Phase I trial. As to represented employees, it concluded the legal standard for determining what constituted compensable hours worked was the “first principal activity” test of the FLSA rather than California's “control test.” It based this conclusion on the language of the MOU's, which it found “unambiguously establishes that the parties agreed that the FLSA's first principal activity test is the controlling legal standard”; evidence that the parties understood they were negotiating under federal law and agreed to adopt the FLSA's test; and the fact that the MOU's were approved by the Legislature and chaptered into law. As to the unrepresented employees, the trial court concluded CalHR had acted within its legislatively delegated authority in applying the FLSA as the standard for measuring compensable hours. As to plaintiffs' claim for common law breach of contract, the court ruled that this claim was subject to the general rule that the terms and conditions of public employment are controlled by statute and ordinance, rather than contract, and that, in any case, plaintiffs had not established the existence of an agreement between the State and plaintiffs to pay overtime.

## II. DISCUSSION

### A. Statutory and Regulatory Scheme Governing California Minimum Wage

“The IWC is a five-member appointive board initially established by the Legislature in 1913. For the first 60 years of its existence, the IWC's mission was to regulate the wages, hours and conditions of employment of *women and children*

9

employed in this state, in furtherance of such employees' 'health and welfare.' To this end, the commission—beginning in 1916—promulgated a series of industry- and occupation-wide 'wage orders,' prescribing various minimum requirements with respect to wages, hours and working conditions to protect the health and welfare of women and child laborers. . . . [¶] . . . [T]he California Legislature in 1972 and 1973 amended the applicable provisions of the Labor Code to authorize the IWC to establish minimum wages, maximum hours and standard conditions of employment for *all* employees in the state, men as well as women. [Citations.] The constitutionality of this legislative expansion of the IWC's jurisdiction to all California workers is explicitly confirmed by article XIV section 1 of the California Constitution which declares: 'The Legislature may provide for minimum wages and for the general welfare of employees and for those purposes may confer on a commission legislative, executive and judicial powers." (*Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 700-701, fn. omitted.) "Today 18 wage orders are in effect, 16 covering specific industries and occupations, one covering all employees not covered by an industry or occupation order, and a general minimum wage order amending all others to conform to the amount of the minimum wage currently set by statute." (*Martinez v. Combs* (2010) 49 Cal.4th 35, 57, fns. omitted (*Martinez*).)

"[T]he IWC's wage orders are entitled to 'extraordinary deference, both in upholding their validity and in enforcing their specific terms.' [Citation.] . . . [¶] The IWC's wage orders are to be accorded the same dignity as statutes. They are 'presumptively valid' legislative regulations of the employment relationship [citation], regulations that must be given 'independent effect' separate and apart from any statutory enactments [citation]. To the extent a wage order and a statute overlap, we will seek to harmonize them, as we would with any two statutes. [Citation.]" (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1027 (*Brinker*).)

Under section 1197, " '[t]he minimum wage for employees fixed by the commission is the minimum wage to be paid to employees, and the payment of a [lower] wage than the minimum so fixed is unlawful.' Under section 1194, 'any employee

receiving less than the legal minimum wage . . . applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage . . .' (*id*., subd. (a)). Accordingly, today, as under the 1913 act, specific employers and employees become subject to the minimum wage only under the terms of an applicable wage order, and an employee who sues to recover unpaid minimum wages actually and necessarily sues to enforce the wage order." (*Martinez*, *supra*, 49 Cal.4th at pp. 56-57.)

California's general minimum wage order (Cal. Code Regs., tit. 8, § 11000, Order No. MW-2001) requires employers to pay wages of at least the minimum wage for "all hours worked." Wage Order 4-2001 (Cal. Code Regs., tit. 8, § 11040) (Wage Order 4), applicable to those employed in professional, technical, clerical, mechanical, and similar occupations,[6] likewise requires an employer to pay each employee wages of at least the minimum wage for "all hours worked." It defines "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so. Within the health care industry, the term 'hours worked' means the time during which an employee is suffered or permitted to work for the employer, whether or not required to do so, as interpreted in accordance with the provisions of the Fair Labor Standards Act." (*Id*., subds. (2)(K), (4)(A).)

## B. Standard of Review

"We independently review the construction of statutes [citation] and begin with the text. If it 'is clear and unambiguous our inquiry ends.' [Citation.] Wage and hours laws are 'to be construed so as to promote employee protection.' [Citations.] These principles apply equally to the construction of wage orders. [Citation.]" (*Mendiola v. CPS Security Solutions, Inc.* (2015) 60 Cal.4th 833, 840 (*Mendiola*).) Where the relevant facts are not in dispute, we face a question of law and are not bound by the trial court's findings. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799; *Mendiola*, 60 Cal.4th at p. 840.) When factual findings are challenged on appeal, we review the findings for

---

[6] There is no dispute that plaintiffs' job classifications fall within the ambit of wage order 4.

substantial evidence, viewing the evidence in the light most favorable to the prevailing party, and upholding the findings if the record contains any substantial evidence, contradicted or uncontradicted, to support them.  (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.)

## C. Failure to Pay Minimum Wage

Plaintiffs contend the State violated California's minimum wage law by failing to pay them for all hours they worked, specifically, for uncompensated pre- and post-work activity.[7]

### 1. Represented Employees

The Dills Act requires the State to meet and confer in good faith with representatives of recognized employee organizations regarding wages, hours, and other terms and conditions of employment.  (Gov. Code, § 3517.)  If they reach agreement, they must prepare an MOU to present to the Legislature for approval, where appropriate.  (Gov. Code, § 3517.5.)  "The circumstances are 'appropriate' '[i]f any provision of the memorandum of understanding requires the expenditure of funds . . .' or if 'legislative action to permit its implementation' is required."  (*Service Employees Internat. Union, Local 1000 v. Brown* (2011) 197 Cal.App.4th 252, 263, fn. 6; see Gov. Code, § 3517.61.)  Under this statutory scheme, " 'virtually all salary agreements are subject to prior legislative approval.  [¶] The act further provides that, except with respect to a number of specific statutes which the Legislature has expressly determined may be superseded by a memorandum of understanding, any provision of a memorandum of understanding in conflict with a statutory mandate shall not be effective unless approved by the Legislature.' "  (*Department of Personnel Administration v. Superior Court* (1992) 5 Cal.App.4th 155, 181 [citing Gov. Code, § 3517.6]; see also *White v. Davis* (2003) 30 Cal.4th 528, 572 (*White*) [provision of MOU embodying a salary agreement "obviously"

---

[7] This includes the time spent travelling between their sign-in and sign-out locations and their work posts, briefing and being briefed, checking equipment in and out, putting on and removing safety equipment, submitting to searches, and taking inventories of equipment.

requires expenditure of funds].)  The MOU then governs the terms and conditions of employment.  (Gov. Code, § 3517.61; *Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989, 1040 ["[O]nce approved by the Legislature[,] . . . [the MOU] governs the wages and hours of the state employees covered by the MOU"].)

Under the federal Portal-to-Portal Act (29 U.S.C. § 251 et seq.), an employer is not subject to liability under the FLSA for failure to pay an employee for "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform" or "activities which are preliminary to or postliminary to said principal activity or activities, [¶] which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities."  (29 U.S.C. § 254(a).)  Title 29, part 553.221(a) of the Code of Federal Regulations provides:  "The general rules on compensable hours of work are set forth in 29 CFR part 785 which is applicable to employees for whom the 7(k) exemption is claimed."  And Title 29, part 553.221(b) of the Code of Federal Regulations, which is contained in Part 785, entitled "Hours Worked," provides that the Portal-to-Portal Act eliminates from the working day certain " 'preliminary' and 'postliminary' activities . . . that are not made compensable by contract, custom, or practice," and that, "[w]ith respect to time spent in any 'preliminary' or 'postliminary' activity compensable by contract, custom, or practice, the Portal-to-Portal Act requires that such time must also be counted for purposes of the Fair Labor Standards Act. . . . [O]nly the amount of time allowed by the contract or under the custom or practice is required to be counted.  If, for example, the time allowed is 15 minutes but the activity takes 25 minutes, the time to be added to other working time would be limited to 15 minutes."  (Italics added.)

California law, as embodied in various wage orders, including Wage Order 4, applies a broader standard, requiring compensation when an employee is subject to the control of an employer.  (*Mendiola*, *supra*, 60 Cal.4th at pp. 839-840; *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 578-579, 588-594 (*Morillion*).)  Plaintiffs contend

they are subject to California's broader rule, not the more restrictive federal rule, and that they are entitled to compensation for the time they spent subject to defendants' control between signing in and beginning their work shifts and between the end of their work shifts and when signing out.[8]

A necessary premise to plaintiffs' argument is that public employees are governed by California wage and hour laws. For this proposition, they rely upon *Guerrero v. Superior Court* (2013) 213 Cal.App.4th 912 (*Guerrero*) and *Sheppard v. North Orange County Regional Occupational Program* (2010) 191 Cal.App.4th 289 (*Sheppard*). The court in *Guerrero* concluded that public agencies were not exempt from the provisions of Wage Order No. 15-2001, which applied to persons employed in household occupations. (*Guerrero*, 213 Cal.App.4th at p. 946, fn. 26.) The court noted that 14 of the 17 industry, occupation, and miscellaneous wage orders expressly exempted public employees from their provisions and, because Wage Order No. 15-2001 did not contain language exempting public agencies or political subdivisions from its coverage, concluded that the IWC did not intend to exempt such political entities from its coverage. (*Id*. at pp. 954-955.) The court relied on *Sheppard*, which construed Wage Order 4. (*Id*. at p. 953.) In *Sheppard*, a threshold question was whether the employee of a school district was covered by the minimum wage section of Wage Order 4. The court reviewed the introductory language of the wage order, which provided that *except* for specific sections—including the section on minimum wage—the order did not apply to employees of the state or political subdivisions. The court therefore concluded the order should be interpreted, "by its terms, to impose the minimum wage provision as to all employees in the occupations described therein, including employees directly employed by the state or

---

[8] "It is settled that the FLSA does not preempt state regulation of wages, hours, and working conditions. [Citations.]" (*California Correctional Peace Officers Assn. v. State of California* (2010) 189 Cal.App.4th 849, 861.) As our high court has explained, "state law may provide employees greater protection than the FLSA." (*Morillion*, 22 Cal.4th at p. 592.)

any political subdivision of the state." (*Sheppard*, at pp. 300-301.)[9] Plaintiffs' premise, therefore, is correct as far as it goes.

Plaintiffs also argue, however, that the protections of California minimum wage law may never be "waived." (§§ 1194, 1197; *Hoover v. American Income Life Ins. Co.* (2012) 206 Cal.App.4th 1193, 1208 [rights accorded by section 1194 "may not be subject to negotiation or waiver"]; see also *Armenta v. Osmose, Inc.* (2005) 135 Cal.App.4th 314, 324 (*Armenta*) ["A review of our labor statutes reveals a clear legislative intent to protect the minimum wage rights of California employees to a greater extent than federally. . . . [¶] . . . California's labor statutes reflect a strong public policy in favor of full payment of wages for all hours worked"].) Any agreement to bargain away that protection, they contend, was void, and the Legislature could not ratify it. Therefore, according to plaintiffs, they are entitled to the benefit of the "control" test of Wage Order 4.

The flaw in plaintiffs' argument is that the MOU's were not only negotiated by CCPOA and the State, but they were also approved by the Legislature, signed by the Governor, and chaptered into law. They are thus not simply agreements between the parties, but laws specifically governing the terms and conditions of plaintiffs' employment. And, it is well established, "the more specific provision [citation] takes precedence over the more general one [citation]. [Citations.] To the extent a specific statute is inconsistent with a general statute potentially covering the same subject matter, the specific statute must be read as an exception to the more general statute. [Citations.]" (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 857.) It is clear to us that the MOU's are more specific than the wage orders of general application promulgated by the IWC.

The fact that the MOU was approved by the Legislature and enacted into law distinguishes this case from *Grier v. Alameda-Contra Costa Transit Dist.* (1976) 55 Cal.App.3d 325 (*Grier*), upon which plaintiffs rely. The plaintiff bus drivers and

---

[9] *Sheppard* also explained that Wage Order 4's predecessor, Wage Order 4-2000, exempted public employers more broadly, providing: " 'The provisions of this Order shall not apply to employees directly employed by the State or any county, incorporated city or town or other municipal corporation, or to outside salespersons.' (Cal. Code Regs, tit. 8, § 11040, former subd. 1(B).)" (*Sheppard*, *supra*, 191 Cal.App.4th at p. 300, fn. 7.)

defendant transit district in *Grier* had negotiated a collective bargaining agreement providing that drivers who were late for work without a satisfactory excuse would serve "penalty point" duty under which they would wait in the dispatching area, without pay, until released for the day or assigned to a run. (*Id*. at p. 329.) The trial court concluded the transit district's labor relations were governed only by the Transit District Law applicable to the counties of Alameda and Contra Costa, which empowered the transit district to administer a personnel system adopted by the board of the district and to negotiate with a collective bargaining unit regarding wages, hours, and working conditions. (*Id*. at pp. 331-332; Pub. Util. Code, § 24501 et seq.) This division of the First Appellate District disagreed. While statutes governing other transit districts contained language that the districts' bargaining powers were not "limited or restricted by the provisions of . . . other laws or statutes" (*Grier*, 55 Cal.App.3d at p. 332, italics omitted), the Legislature omitted this language from the provisions governing the Alameda-Contra Costa County Transit District. The court therefore concluded the Legislature did not intend the district's labor relations to be governed *only* by the applicable Public Utility Code provisions, but rather, that the district's rules and regulations, "including those adopted by a resolution approving a collective bargaining agreement, must themselves be promulgated *subject to* the limitations and restrictions of other applicable laws." (*Id*. at p. 333.) *Grier* does not stand for the proposition that a labor agreement approved by the *Legislature* is subject to inconsistent labor laws of general application.

Plaintiffs argue that even if the parties *could* have bargained away the protection of Wage Order 4, they in fact *did not* agree to have the represented plaintiffs' compensable time measured by federal, rather than state, law. Both the language of the MOU's and the circumstances of their negotiation demonstrate otherwise. Each MOU contained a section entitled "7K Exemption," which recited that the employees were working under the provisions of Section 207(k) of the FLSA and that the State was declaring a specific exemption for them, and established a 164-hour, 28-day work period consisting of 160 hours for posted duty and four hours for pre- and post-work activities.

16

In each of the MOU's except that formed in 2011, CCPOA and the State agreed that four hours was generally sufficient for all such activities, that they had "made a good faith attempt to comply with *all requirements of the FLSA* in negotiating this provision," and that "[i]f any court of competent jurisdiction declares that any provision or application of this Agreement is not in conformance with the FLSA, the parties agree to [m]eet and [c]onfer immediately."[10] (Italics added.) And, as we have explained, the regulations governing compensable hours of work for employees subject to a 7k exemption provide that only the amount of time allowed by a contract or under the custom or practice need be counted. (29 C.F.R. §§ 553.221(a), 875.9(a).) Plaintiffs cannot now rewrite their agreement to include hours worked that are not contained in the MOU's.

The evidence also supports the trial court's finding that, when negotiating the 1998-1999 MOU, the parties understood they were proceeding under the FLSA's standards and employees would not be entitled to compensation for the time they spent between entering the institution and picking up their equipment or the time after the equipment was returned. This agreed-upon schedule continued for all succeeding MOU's.[11] The trial court properly concluded, as both a factual and legal matter, that the FLSA, not California's minimum wage law, governed plaintiffs' claims as to the represented employees.

### 2. *Unrepresented Employees*

The trial court concluded the FLSA also provided the legal standard for measuring the compensable hours worked by the subclass of unrepresented employees. The court reasoned that CalHR had established work week groups detailed in the California Pay Scale Manual, that all the job classifications in the subclass were contained in Work Week Group 2, and that CalHR had determined that Work Week Group 2 positions were

---

[10] The 2011 MOU omitted these terms, but the parties agreed any changes would not prejudice their positions in this litigation.

[11] Plaintiffs make no contention that we should reach a different result for later periods at issue here than for the earlier periods.

17

subject to the FLSA. The "Work Week Group Definitions" in the Pay Scale Manual included a section describing "Work Week Groups Established Under [FLSA]." A subsection entitled "Hours Worked" provided that, "For the purpose of identifying hours worked under the provisions of the FLSA, only the time spent which is controlled or required by the State and pursued for the benefit of the State need be counted." In a subsection entitled "Determination of Coverage under FLSA," the document stated that "provisions of Work Week Group 2 are made applicable to all classes which are determined by the Director of the Department of Personnel Administration to include positions subject to the FLSA." A subsection entitled "Work Periods" provided that "The beginning of a work week may be changed if the change is intended to be permanent and it is not designed to evade the overtime provision of the FLSA." The subsection entitled "Overtime Compensations" establishes standards for "FLSA overtime worked."[12] After reviewing these provisions, the court concluded, "At all relevant times and consistent with its legislatively delegated authority, CalHR has applied the FLSA as the standard for measuring plaintiffs' compensable hours worked. It follows that, as applied here, the FLSA standard of compensability constitutes state law."

Plaintiffs challenge this conclusion, arguing that CalHR could not, and did not, supersede Wage Order 4, which defines "hours worked" to mean "the time during which an employee is subject to the control of an employer." (Cal. Code Regs., tit. 8, § 11040, subd. (2)(K).)

Defendants, on the other hand, contend that CalHR, using its delegated authority to set salaries for unrepresented employees, fixed the FLSA as the controlling legal standard for compensable hours worked by virtue of the definition of Work Week Group 2 found in the California Pay Scale Manual. (See *California Assn. of Professional Scientists v. Department of Finance* (2011) 195 Cal.App.4th 1228, 1232 ["[t]he

_____

[12] Government Code section 19845, subdivision (a) provides: "Notwithstanding any other provision of this chapter, the department is authorized to provide for overtime payments as prescribed by the Federal Fair Labor Standards Act. . . ."

Legislature has delegated to DPA the authority to set salaries for state employees excluded from collective bargaining"]; see also Gov. Code §§ 19843, subd. (a) ["The [DPA], after considering the needs of the state service and prevailing overtime practices, may establish workweek groups of different lengths or of the same length but requiring different methods of recognizing or providing compensation for overtime"], 19849, subd. (a) ["[t]he department shall adopt rules governing hours of work and overtime compensation . . ."].)  And Government Code section 19845 authorizes CalHR "to provide for overtime payments as prescribed by the Federal Fair Labor Standards Act to state employees."  (Gov. Code, § 19845, subd. (a).)

On this record, we agree with plaintiffs.  We have already concluded that plaintiffs' premise—that (unless superseded) the minimum wage provisions of Wage Order 4 apply to state employees—is correct.  The question, then, is whether the Pay Scale Manual, like the MOU, displaces the state standard.  As we shall explain, while the question is a close one, we conclude the answer is no.

There is at least some tension between Wage Order 4 and CalHR's definition of Work Week Group 2, which relies upon the FLSA.  But our Supreme Court has explained that wage orders are entitled to " 'extraordinary deference,' " and have "the same dignity as statutes."  (*Brinker*, *supra*, 53 Cal.4th at p. 1027.)  They are " 'presumptively valid' legislative regulations of the employment relationship [citation], regulations that must be given 'independent effect' separate and apart from any statutory enactments [citation].  To the extent a wage order and a statute overlap, we will seek to harmonize them, as we would with any two statutes.  [Citation.]"  (*Ibid.*; see also *Flowers v. Los Angeles County Metropolitan Transportation Authority* (2015) 243 Cal.App.4th 66, 82 [construing statute so as not to conflict with wage order].)

We first note that, unlike the MOU's, the Pay Scale Manual is not a legislative enactment.  Moreover, the manual itself uses language parallel to Wage Order 4 regarding the definition of "hours worked."  Wage Order 4 defines "hours worked" as

"the time during which an employee is subject to the control of an employer."[13] Similarly, the manual provides that "only the time spent which is *controlled or required* by the State and pursued for the benefit of the State need be counted."[14] And, unlike the federal Portal-to-Portal Act, this provision of the Pay Scale Manual includes no language excluding time spent on pre- and post-work activities. (See 29 U.S.C. § 254(a).)[15]

---

[13] This definition goes on to provide, "*Within the health care industry*, the term 'hours worked' means the time during which an employee is suffered or permitted to work for the employer, whether or not required to do so, *as interpreted in accordance with the provisions of the Fair Labor Standards Act*." (Cal. Code Regs., tit. 8, § 11040, subd. (2)(K), italics added.) In *Mendiola*, our high court rejected an argument that the federal standard for measuring hours worked for resident employees should be applied to security guards who were subject to Wage Order 4, noting: "[L]anguage in Wage Order 4 demonstrates that the IWC knew how to explicitly incorporate federal law and regulations when it wished to do so. For example, the wage order provides that, *within the health care industry*, hours worked should be interpreted in accordance with the FLSA. (Wage Order 4, subd. 2(K).) But the order makes *no* reference to federal law applying in the case of guards. The language chosen by the IWC does not support [defendant's] argument that a broad importation [of federal rules] was intended. Indeed, it supports the contrary conclusion: *The IWC intended to import federal rules only in those circumstances to which the IWC made specific reference*." (*Mendiola*, *supra*, 60 Cal.4th at p. 843, italics added.)

[14] As the trial court noted, this mirrors the language of 29 Code of Federal Regulations Part 785.7, which states: "The United States Supreme Court originally stated that employees subject to the act must be paid for all time spent in 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.' [Citation.] Subsequently, the Court ruled that there need be no exertion at all and that all hours are hours worked which the employee is required to give his employer, that 'an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. . . .' [Citations.] The workweek ordinarily includes 'all the time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed work place'. [Citation.] The Portal-to-Portal Act did not change the rule *except to provide an exception for preliminary and postliminary activities*. See § 785.34." (Italics added.)

[15] We do not opine on whether Wage Order 4 *can* be supplanted by the Pay Scale Manual, but conclude that, in its current iteration, the Manual does not do so.

20

We conclude it is possible to harmonize the California Pay Scale Manual and Wage Order 4, as we must seek to do under *Brinker*. (*Brinker*, *supra*, 53 Cal.4th at p. 1027.) The manual does not expressly state that law enforcement employees are not subject to the provisions of the wage orders applicable to their job classifications, nor does it contain any provisions concerning compensation for pre- and post-work activities. Wage Order 4, on the other hand, explicitly provides that its "Definitions" (section 2) and "Minimum Wages" (section 4) provisions apply to employees of the State. (Cal. Code Regs., tit. 8, § 11040, subd. 1(B).) The section related to "Hours and Days of Work," which governs "Daily Overtime" and "Alternative Workweek Schedules," does *not* apply to state employees. (*Id.*, subds. (1)(B), (3).) We may reasonably construe the regulatory schemes to mean that entitlement to overtime compensation is controlled by the FLSA but that the meaning of "hours worked" is governed by Wage Order 4. Such a construction does violence to neither regulatory scheme.

Accordingly, we conclude the unrepresented employees are entitled to pay for all hours worked under the applicable California standard rather than the FLSA's standard. We shall therefore remand the matter to the trial court for further proceedings, in which it will determine whether, and to what extent, the unrepresented employees were not compensated for their work.

### D. Breach of Contract

The trial court ruled against plaintiffs on their cause of action for failure to pay overtime in breach of their common law contractual obligation. As to the subclass of represented employees, the court concluded "[t]he comprehensive and exclusive nature of the MOUs forecloses the Represented Employees from asserting common law claims for overtime." As to the unrepresented employees, the court stated, "the terms of their employment are established by CalHR pursuant to the Government Code. CalHR has established specific rules addressing the subject of overtime pay, thereby foreclosing plaintiffs' common law claims. [¶] Moreover, plaintiffs failed to persuasively establish at trial the existence of any agreement to pay overtime to the Unrepresented Employees. [Citation.] The Court finds and concludes that there was no such agreement." Plaintiffs

21

argue this ruling was error, and that they have the contractual right to overtime pay on the performance of work.

Plaintiffs rely primarily on *Madera Police Officers Assn. v. City of Madera* (1984) 36 Cal.3d 403 (*Madera*) and *White*, *supra*, 30 Cal.4th 528. The issue in *Madera* was whether the constraints placed on the activities of city police officers during their mealtime break were so restrictive that the breaks constituted work time, entitling them to overtime pay. (*Madera*, 36 Cal.3d at p. 406.) After ruling that the meal periods constituted work time, our high court concluded that the city's ordinances and regulations mandated overtime pay for work performed in excess of the normal eight-hour day and 40-hour week. (*Id.* at pp. 409-413.) The court went on to explain: " '[T]o the extent services are rendered under statutes or ordinances then providing mandatory compensation for authorized overtime, the right to compensation vests upon performance of the overtime work, ripens into a contractual obligation of the employer and cannot thereafter be destroyed or withdrawn without impairing the employee's contractual right.' [Citation.] The [meal period] time of the sergeants, officers and dispatchers was work in excess of the eight-hour day, and the employees' right to overtime compensation, mandated by the city regulations, vested upon performance." (*Id.* at pp. 413-414; see also *Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 22 ["A claim for compensation owed by an employer for services already performed is contractual . . ."].) In *White*, our high court concluded that, although employees who worked during a budget impasse had no right to the immediate payment of salary in the absence of a duly enacted appropriation, "employees who work during a budget impasse obtain a right, *protected by the contract clause*, to the ultimate payment of salary that has been earned." (*White*, *supra*, 30 Cal.4th at pp. 570-571.)

The court in *Sheppard* reached a similar conclusion. The plaintiff there, a part-time instructor for a program created by four public school districts, was required to spend 20 minutes of unpaid time preparing for every hour he spent teaching. Among the claims he asserted was one for breach of contract, and the trial court sustained the defendant's demurrer, which was made on the ground that " 'public employees hold their

22

positions by statute and are prohibited from maintaining a cause of action for breach of contract . . . ' " (*Sheppard*, *supra*, 191 Cal.App.4th at pp. 293-294, 311.) The appellate court reversed. Noting that the breach of contract claim was directed solely at recovering earned but unpaid wages, the court concluded that under Supreme Court authority, the plaintiff had a contractual right to such wages, protected by the contract clause of the state Constitution, and that his contract claim was not defeated by his status as a public employee. (*Id*. at pp. 311-313, citing *White*, *supra*, 30 Cal.4th 528, *Miller v. State of California* (1977) 18 Cal.3d 808, 814 [public employee pension laws establish contractual rights], and *Kern v. City of Long Beach* (1947) 29 Cal.2d 848, 853 [right of public employee to payment of earned salary protected by contract clause of Constitution].)

Also of note, our Supreme Court has concluded that "contractual rights may be implied from an ordinance or resolution when the language or circumstances accompanying its passage clearly evince a legislative intent to create private rights of a contractual nature enforceable against [a] county." (*Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1177 (*Retired Employees*).) In *Retired Employees*, at the request of the United States Court of Appeals for the Ninth Circuit, the court considered the abstract question of whether, under state law, a California county and its employees can form an implied contract that confers on retired employees vested rights to health benefits. (*Id*. at p. 1176.) The court answered that question in the affirmative, so long as there was no legislative prohibition against such an arrangement such as a statute or ordinance. (*Id*. at pp. 1176, 1194.) In doing so, it noted that a contract may be express or implied, and that even a written contract may contain implied terms. (*Id*. at pp. 1178-1179.) However, " 'the law does not recognize implied contract terms that are at variance with the terms of the contract *as expressly agreed or as prescribed by statute*.' [Citations.]" (*Id*. at p. 1181, italics added; see also *Sonoma County Ass'n of Retired Employees v. Sonoma* (9th Cir. 2013) 708 F.3d 1109, 1114 [following *White* and stating "an ordinance or resolution can create a contract when the

23

legislation's text or the 'circumstances accompanying its passage' clearly evince an intent to contract, as opposed to an intent to make policy"].)[16]

With respect to the subclass of represented employees, we agree with the trial court that plaintiffs have not established a contract that would support their claim. We have already concluded that the State and CCPOA agreed to have their compensable time measured by federal, rather than state, law. Each MOU provided that it "set[] forth the full and entire understanding of the parties regarding the matters contained herein . . ." And each was approved by the Legislature. There is no basis to conclude that either the parties or the Legislature intended to create an implied right to compensation in addition to that agreed to in the MOU's. (See *Retired Employees*, *supra*, 52 Cal.4th at p. 1177; *Chisom v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 218 Cal.App.4th 400, 415 ["an implied term may not be found where it would contradict the express terms of the contract"].)

We reach a different result as to the subclass of unrepresented employees. We have already concluded they are entitled to compensation for all hours worked under California's broader standard. And *Madera*, *White*, and *Sheppard* teach that a breach of contract claim may be based on earned but unpaid wages. (*Madera*, *supra*, 36 Cal.3d at pp. 413-414; *White*, *supra*, 30 Cal.4th at pp. 570-571, *Sheppard*, *supra*, 191 Cal.App.4th at pp. 311-313.) To the extent the unrepresented employees are entitled to additional compensation for hours worked, based on the overtime policies in effect at the time they performed that work, they may assert those claims in a cause of action for breach of contract.

---

[16] The court also noted that "[a] contractual right can be implied from legislation in appropriate circumstances. [Citation.] Where, for example, the legislation is itself the ratification or approval of a contract, the intent to make a contract is clearly shown." (*Retired Employees*, *supra*, 52 Cal.4th at p. 1187.)

### E. Violation of Sections 222 and 223

Plaintiffs' final challenge is to the trial court's grant of judgment on the pleadings as to their cause of action for failure to pay contractual overtime in violation of sections 222 and 223.

Section 222 provides: "It shall be unlawful, in case of any wage agreement arrived at through collective bargaining, either willfully or unlawfully or with intent to defraud an employee, a competitor, or any other person, to withhold from said employee any part of the wage agreed upon." Section 223 provides: "Where any statute or contract requires an employer to maintain a designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract." The trial court concluded that these statutes are not applicable to public employers and that, in addition, plaintiffs had not alleged facts sufficient to state a claim for violation of section 223 because they did not allege secret deductions or "kickbacks."

We agree with the trial court that plaintiffs cannot maintain this cause of action. As to the subclass of *represented* plaintiffs, we have already concluded that they agreed to have their hours worked measured by federal law and that the Legislature approved this arrangement. Their causes of action for violations of sections 222 and 223 necessarily fail. The subclass of *unrepresented* plaintiffs has no cause of action for a violation of section 222, since that statute, by its terms, applies only to parties to a collective bargaining agreement.

We also agree with the trial court that the unrepresented employees may not maintain their cause of action for violation of section 223. Our high court has explained that "[t]he use of the device of deductions creates the danger that the employer, because of his superior position, may defraud or coerce the employee by deducting improper amounts. . . . [I]t was the utilization of secret deductions or 'kick-backs' to make it appear that an employer paid the wage provided by a collective bargaining contract or by a statute, although in fact he paid less, that led to the enactment of Labor Code sections 221-223 in 1937. These sections, this court said in *Sublett v. Henry's etc. Lunch*[ (1942)] 21 Cal.2d 273, 274, 'are declarative of an underlying policy in the law which is opposed

25

to fraud and deceit.' " (*Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal.2d 319, 328-329; see also *Brown v. Superior Court* (2011) 199 Cal.App.4th 971, 991 [section 223 " 'was enacted to address the problem of employers taking secret deductions or "kickbacks" from their employees' "], citing *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1205.) Plaintiffs did not allege any facts demonstrating that the State used secret deductions or deceived them in any way.

Plaintiffs argue, however, that a violation of section 223 may be found even in the absence of a secret agreement. They draw our attention to *Armenta*, *supra*, 135 Cal.App.4th at p. 323 and *Gonzalez v. Downtown LA Motors, LP* (2013) 215 Cal.App.4th 36, 48-50 (*Gonzalez*). In *Armenta*, the plaintiffs, employees of a business that maintained utility poles, alleged they were not paid for time they spent carrying out such tasks as loading equipment and supplies, traveling to their work site in company vehicles, and preparing paperwork, and they asserted a minimum wage claim for those hours. (*Armenta*, 135 Cal.App.4th at p. 317.) The company contended it did not violate California's minimum wage law because the employees were compensated weekly at an amount greater than the total hours worked multiplied by the minimum wage; that is, the employees' *average* hourly rate was higher than California's minimum wage. (*Id*. at p. 319.) The appellate court rejected this argument, noting as it did so that sections 221,[17] 222, and 223 "articulate the principal that all hours must be paid at the statutory or agreed rate and no part of this rate may be used as a credit against a minimum wage obligation." (*Armenta*, 135 Cal.App.4th at p. 323.) The employees in *Gonzalez*, service technicians at an automobile dealership, were paid on a "piece-rate" basis, under which they were paid at a flat rate for each task they performed on automobiles. While they were not repairing vehicles, they sometimes had to perform other tasks. The employer tracked all the time the technicians were at the worksite and supplemented their pay if the amount the

---

[17] Section 221 provides: "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."

26

technicians earned for their piece-rate tasks was less than the amount they would have earned if they were paid the minimum wage for all their hours "on the clock." (*Gonzalez*, 215 Cal.App.4th at pp. 41-42.) The technicians brought an action claiming the employer had failed to pay the minimum wage during the time they were not performing repairs. (*Id.* at p. 42.) The appellate court concluded this method of pay violated Wage Order 4. In the course of doing so, it applied the reasoning of *Armenta*, noting that sections 221, 222, and 223 govern an employer's obligation to pay wages, and that the employer's method of averaging wages would result in some technicians not receiving pay for all their nonproductive time. (*Gonzalez*, at p. 50.)

Neither *Armenta* nor *Gonzalez* presents the situation we face here: Plaintiffs are not using sections 221, 222, and 223 to support a minimum wage claim, but instead assert a stand-alone cause of action for violation of section 223, which by its terms applies to an employer who "*secretly* pay[s] a lower wage while purporting to pay the wage designated by statute or by contract." (Italics added.)[18] While the term "secretly" may reasonably be applied where an employer seeks to average the total pay for both compensated and uncompensated time, it would stretch the meaning of the word beyond all recognition to apply it here, where the only issue is a bona fide dispute about whether the time the employees spent on pre- and post-work activities constituted hours worked.

We conclude, therefore, that the trial court properly granted judgment on the pleadings as to the causes of action for violations of sections 222 and 223. We need not address the additional question of whether public entities are subject to those statutory provisions.

---

[18] Noting that section 225 makes it a misdemeanor to violate section 223 and that section 225.5 establishes civil penalties for violating that statute, a federal district court has concluded the Legislature did not intend to create a private right of action for violation of section 223. (*Calop Bus. Sys. v. City of Los Angeles* (C.D.Cal. 2013) 984 F.Supp.2d 981, 1015; accord *Johnson v. Hewlett-Packard Co.* (N.D.Cal. 2011) 809 F.Supp.2d 1114, 1136, affd. 2013 U.S. App. Lexis 18497.) The parties have not raised this issue, and we need not consider it.

### III. DISPOSITION

The judgment as to the subclass of unrepresented employees is reversed as to the second and fourth causes of action, and the matter is remanded to the trial court for further proceedings not inconsistent with this opinion.  In all other respects, the judgment is affirmed.

_____
Rivera, J.

We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.


*Kurt Stoetzl et al. v. State of California, Department of Human Resources et al.* (A142832)

Trial Court: San Francisco County Superior Court

Trial Judge: Honorable John E. Munter

Counsel for Plaintiffs and Appellants: Carroll, Burdick & McDonough LLP, Jack T. Friedman, Jonathan D. Yank, Laurie J. Hepler, and David M. Rice; Messing Adam & Jasmine LLP, Gregg McLean Adam; and Goyette and Associates, Inc., Gary G. Goyette.

Counsel for Defendants and Respondents: Kronick, Moskovitz, Tiedemann & Girard, David W. Tyra and Kristianne T. Seargeant; California Department of Human Resources, Joan A. Markoff, Chief Counsel, Frolan R. Aguiling, Deputy Chief Counsel, Christopher E. Thomas, Labor Relations Counsel, and David D. King, Labor Relations Counsel.